# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |  |
|---|---|---|
| _____ ) | | |
| **JEAN D. FRANCIS,** | ) | |
| **4602 Stecoah Drive** | ) | |
| **Clinton, MD  20735** | ) | |
|  | ) | |
| **Plaintiff,** | ) | |
|  | ) | |
| **v.** | ) | **Case No.:  16-763** |
|  | ) | |
| **THOMAS E. PEREZ, Secretary of Labor,** | ) | |
| **DEPARTMENT OF LABOR,** | ) | **JURY TRIAL DEMAND** |
| **Frances Perkins Building** | ) | |
| **200 Constitution Avenue, N.W.** | ) | |
| **Washington, D.C.  20210** | ) | |
|  | ) | |
| **Defendant.** | ) | |
| _____) | | |

## COMPLAINT

Plaintiff Jean D. Francis, PhD, by and through counsel, hereby files this Complaint for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a, against Defendant Thomas E. Perez, Secretary of Labor, U.S. Department of Labor.

## JURISDICTION AND VENUE

1. This court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e *et seq.*, and 29 U.S.C. § 633a.

2. Plaintiff has exhausted all administrative remedies prior to filing suit.

3. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) in that all or some events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and Defendant may be found in this judicial district.

## PARTIES

4.     Plaintiff Jean D. Francis, PhD, (hereinafter "Plaintiff" or "Dr. Francis") is an African American woman whose national origin is the West Indies.  Dr. Francis is a citizen of the United States and a resident of Prince George's County, Maryland.

5.     Defendant Thomas E. Perez (hereinafter "Defendant" or the "Agency") is the Secretary of the U.S. Department of Labor ("DOL"), an administrative agency of the United States government and an "employer" within the meaning of the statutes under which Plaintiff brings her claims.

## FACTUAL ALLEGATIONS

6.     Dr. Francis worked for the Department of Labor from June 10, 2007 until she was terminated from employment on May 9, 2014.

7.     Dr. Francis is a long time civil servant who, at the time of her termination, had worked for the United States government and armed forces for approximately twenty-five (25) years.  She was employed by the United States Army from 1987 to 2011, the Department of the Interior from 2011 to 2004, and the Department of Homeland Security from 2004 to 2007 when she was hired by the Department of Labor.  Throughout her career, before she was hired by the Agency, she consistently earned excellent performance reviews, and in July 2012, she completed a PhD in Organization Management with a concentration in Leadership.

8.     Dr. Francis began employment with the Agency as the Chief of Budget Formulation, GS-15, for the Office of Management, Administration and Planning ("OMAP") of the Employment Standards Administration ("ESA") on June 10, 2007.

9.     On the second Friday after the start of her employment, Dr. Francis, who is a Seventh Day Adventist, left work at 8:30 p.m. to observe the Sabbath, which is a day of religious

observation that requires abstinence from work from Friday evening to Saturday evening.  Her supervisors reprimanded her for leaving work to observe the Sabbath and told her that she would not have been hired had the Agency known that she was a Seventh Day Adventist.

10.     In July 2007, Dr. Francis contacted Annabelle Lockhart, the Agency's Civil Rights Director, and Mark Wilson, Deputy Assistant Secretary of ESA, and reported to them that her supervisors were discriminating against her based on her religion.

11.     After Dr. Francis reported that her supervisors were harassing her based on her religion, her supervisors began to retaliate against her by making false and unjustified critiques of her performance and taking actions to remove her from her position.  In January 2009, Dr. Francis' supervisors gave her an unsatisfactory performance evaluation and placed her on a Performance Improvement Plan ("PIP") based on false and unsupported claims of performance deficiencies, including false allegations that she failed to formulate the budget on time, when she had completed all her assignments, including formulating the budget on time.

12.     In June 2009, before the conclusion of the PIP, her supervisor removed Dr. Francis her from her position as Chief for Budget Formulation, demoted her to the position of Special Assistant, and relocated her from an office to a cubicle in front of her former office.

13.     Immediately after she was demoted, Dr. Francis filed an internal complaint with the Agency's Equal Employment Opportunity ("EEO") office in which she reported that her supervisors were retaliating and discriminating against her based on her religion and national origin.

14.     In early November 2009, the ESA was abolished, and Dr. Francis was reassigned to a GS-15 Lead Budget Analyst position with the Departmental Budget Center ("DBC") of the Office of the Secretary for Administration and Management ("OASAM") on November 8, 2009.

Her first-line supervisor in the DBC was Geoffrey Kenyon (Caucasian, mid-40s, no prior EEO activity), and her second-line supervisor was T. Michael Kerr (Caucasian, early 50s, no prior EEO activity), Assistant Secretary for Administration.

15.     Mr. Kenyon did not provide Dr. Francis with performance standards for over seven months.  He did not issue her any performance standards until June 20, 2010, when he asked Dr. Francis to agree to back date the standards to November 9, 2009.

16.     Dr. Francis' official job title with the ESA was Budget Analyst Team Lead and her position description indicated that she was responsible for directing the work of analysts assigned to all budget accounts of the Department, including salary and expenses accounts, grant program accounts, and non-appropriated, permanent authority accounts, such as the Unemployment Trust Fund.  Her official delineated duties included developing, planning and implementing program strategies for the Department's Congressional and Presidential budget justifications; reviewing the DBC's efficiency procedures and internal controls; leading reviews of the Agency's compliance with federal appropriations laws and Agency policies; representing the Agency in formal conferences and briefings before the Office of Management and Budget ("OMB") and Congressional staff to justify and defend budget estimates and appropriation requests; and addressing budgetary issues, as they arise, in conjunction with OMB officials and Agency program managers.

17.     However, Dr. Francis was not permitted to perform any of these Budget Analyst Team Lead duties.  Instead, Mr. Kenyon only assigned her lower level duties, such as assisting the DBC director with customer service efforts; clearing departmental documents; scheduling budget meetings and developing agendas; and developing training for the Agency's Budget Officers (ABOs).  Mr. Kenyon told her that her position "was not a position" and referred to her as only a

"training coordinator." Mr. Kenyon consistently rated Dr. Francis on these training coordinator tasks, rather than the duties stated in her official position description. The only explanation Dr. Francis received regarding the justification for the discrepancy between the duties of her official position and her actual responsibilities was that there was "a change in the President's Management Agenda."

18.     In June 2010, Dr. Francis complained to her supervisor, Mr. Kenyon, that she had not been assigned any work since the start of her tenure at DBC. She reported that although she would regularly approach her colleagues to see if she could assist on any projects, she frequently had no work at all. Mr. Kenyon replied by telling her that her position "wasn't a job." Shortly thereafter, Mr. Kenyon assigned her to work on a ninety day project with the team of Christopher Calegero (Caucasian, late 30s). At the conclusion of this project, Mr. Kenyon again refused to give her any assignments.

19.     In October 2010, Mr. Kenyon rated Dr. Francis' performance for the 2009-2010 rating period as "exceptional", but failed to properly credit her for her work on the budget assignment with Mr. Calegero's team and instead referred to her work as only assisting Mr. Calegero on a special project. He also rated her on training coordinator duties, rather than the official duties of her position. Dr. Francis again reported to Mr. Kenyon that she was not being given assignments and was not being given any budget analyst work. Throughout her employment at DBC, Dr. Francis repeatedly requested that Mr. Kenyon give her assignments and budget analyst responsibilities, but he would not.

20.     During the October 2010 meeting concerning Dr. Francis' 2009-2010 performance evaluation, Mr. Kenyon also informed her that she would no longer be working on budget issues, but instead would work solely on education and training development initiatives. Dr. Francis

requested training to help her perform these duties, since her experience and training was as a budget analyst, but Mr. Kenyon denied her request and stated that the training was not for her, but for Agency employees who had been in the department for a long time.   In contrast, younger, Caucasian, and male employees at the GS-15 level were not denied training for their positions and were permitted to participate in numerous training opportunities.

21.     Dr. Francis was the only non-administrative GS-15 employee at DBC who is a racial minority and not American-born.   Dr. Francis was the only GS-15 team lead who was not assigned to supervise any other Agency employees.   Unlike Dr. Francis, younger, Caucasian, and American-born team leads were given supervisor duties and were responsible for leading a team of lower-level employees.   Further, younger, Caucasian, and American-born team leads were invited to attend meetings from which Dr. Francis was excluded.

22.     In addition, Dr. Francis was even treated less favorably than lower level budget analysts who were not team leads.   Younger, Caucasian, and American-born budget analysts were all given budget assignments.   However, Mr. Kenyon did not give Dr. Francis any budget assignments at all.   Instead, he prevented Dr. Francis from working in her field as a budget analyst and only assigned her training coordinator duties.

23.     On or around November 4, 2011, Dr. Francis had a teleconference with her second-line supervisor, Mr. Kerr.   She reported that she was not permitted to perform work consistent with her position description and told him that Mr. Kenyon had unfairly rated her performance based on training coordinator duties, rather than the duties of her official position.   Dr. Francis also requested Mr. Kerr assist her in obtaining a reassignment or a detail, which would permit her to perform budget analyst duties, since she was a budget analyst.   Mr. Kerr promised Dr. Francis that he would look into her concerns, but he never responded.

24.     On June 18, 2012, Dr. Francis took a detail with the Department of Justice, (DOJ), Office of Justice Programs ("OJP"), Office of the Chief Financial Officer ("OCFO").   Before leaving for her detail, Dr. Francis met with Mr. Kenyon for her mid-year review meeting on or around May 31, 2012.   Mr. Kenyon asked Dr. Francis if she planned to return to the DOL and promised that she would be assigned a position if she returned to the DOL.

25.     During her tenure with the Department of Justice, Dr. Francis' supervisor, Ralph Martin, did not have any complaints about her performance and instead, described her "positive attitude", called her a "hard worker", praised her "can-do attitude", and described how she was "persistent in getting internal and external staff to collaborate."   Mr. Martin never described Dr. Francis as a "poor performer" and he even requested an additional sixty to ninety day extension of Dr. Francis' detail through March 9, 2013, so she could assist with a new project.

26.     Partway through her detail at the Department of Justice, in October 2012, Mr. Kenyon issued Dr. Francis her 2011-2012 performance evaluation.   Mr. Kenyon rated her performance as "meets expectations," even though he had told Dr. Francis that her performance was good during her mid-year evaluation and did not identify any issues with her performance. Further, the evaluation failed to include any of the detailed feedback provided by Dr. Francis' supervisor at the Department of Justice.   Dr. Francis objected to the evaluation excluding the feedback from her detail to the Department of Justice, and Mr. Kenyon reissued her 2011-2012 performance evaluation to include this feedback.   However, the new evaluation also failed to adjust her performance rating based on positive feedback from the Department of Justice.

27.     In November 2012, Dr. Francis met with Mr. Kenyon to discuss her revised 2011-2012 performance evaluation and she asked him for recommendations on how she could improve her performance.   Instead of providing her with constructive feedback concerning her work, Mr.

Kenyon raised his voice and told Dr. Francis that to improve her performance, he expected her, as a GS-15, to "develop relations with the ABOs and take them out to lunch."

28.     On November 12, 2012, Dr. Francis sent Mr. Kerr a memorandum in which she complained that her performance appraisal was false, reported that she was being subjected to discrimination, retaliation, and harassment and complained that Mr. Kenyon inappropriately directed her to develop relations with the ABOs and take them out to lunch.  Mr. Kerr failed to take any action to address her complaints.

29.     On or around March 9, 2013, Dr. Francis returned to the Agency's DBC.  Before returning to the DBC, Dr. Francis reached out to Mr. Kenyon and asked about the job he had promised her, and Mr. Kenyon told Dr. Francis he did not recall his promise.

30.     For the first two to three weeks after she returned to the Department of Labor, Mr. Kenyon did not assign Dr. Francis any work.  When he finally began to assign Dr. Francis work, Mr. Kenyon continued to assign her lower level training coordinator duties.

31.     Because Dr. Francis was not permitted to perform her official duties as a "Lead Budget Analyst", was assigned lower level training coordinator duties, and was not given enough work, she attempted to maintain her level of experience and qualifications in her field by seeking out additional training and taking on additional work.  On or around March 13, 2013, she accepted a part-time adjunct position with the American Public University Systems ("APUS"), which would enable her to teach budget and financial management personnel and fill skills gaps in the DBC.  In addition, Dr. Francis took advantage of free training offered to faculty towards obtaining a teaching certification and regularly took free courses offered at APUS.  Although she wished to take advantage of additional employee training and development, Mr. Kenyon stated that the Department did not have the money for training employees because of "sequestration" and all

personnel should identify free training and engage in such training in their free time.

32.     On or around April 9, 2013, Mr. Kenyon asked to meet with Dr. Francis to give her assignments. At this time, Mr. Kenyon's attitude towards her had changed, and he gave her assignments with unreasonable deadlines and began e-mailing Dr. Francis on the status of these assignments on a weekly basis, rather than stopping by her cubicle to talk to her about a specific task when necessary, which he previously did. Prior to this meeting, Mr. Kenyon had never given Dr. Francis deadlines on assignments and did not monitor her progress on assignments on a weekly basis. In addition, there was no reason for him to monitor Dr. Francis' performance of tasks because she always completed her assignments in a satisfactory and timely manner. Dr. Francis found Mr. Kenyon's micromanaging of her work to be demeaning and harassing.

33.     Mr. Kenyon did not micromanage or monitor the performance of Dr. Francis' younger, male, and Caucasian GS-15 colleagues, and Dr. Francis' younger, male and Caucasian colleagues regularly left work in the afternoon for multiple hours at a time for "coffee breaks," and were not questioned about their location or the status of their work.

34.     In May 2013, Dr. Francis told Mr. Kenyon that she found his weekly e-mails harassing, but he ignored her complaint and told her he would e-mail her again the following week.

35.     Mr. Kenyon gave Dr. Francis unreasonable tasks and deadlines on several assignments. For example, on April 9, 2013, he instructed her to develop a comprehensive training plan, and she completed the plan and sent it to him by the deadline in May 2013. Mr. Kenyon indicated that the plan was not complete or acceptable because it did not include an accepted list of courses. However, Dr. Francis had provided a list of proposed training areas, but she needed information from DBC team leads identifying skill gap areas and feedback on the plan before she could develop a list of courses, and she had not received this information at the time she submitted

the comprehensive training plan.

36.     In addition, Mr. Kenyon unreasonably demanded Dr. Francis schedule individual meetings with twenty-five different Agency Budget Officers to present her new training plan beginning on June 7, 2013 and provide detailed summaries of all meetings by June 19, 2013. However, Dr. Francis was pre-approved to take leave from June 10 through June 26, 2013, and many of the ABOs were on leave in June 2013.  Therefore, it was impossible for her to complete the summaries and meetings by June 19, 2013.

37.     On or around June 16, 2013, Dr. Francis informally reported to the EEO office that Mr. Kenyon was subjecting her to retaliation and discrimination based on her sex, age, and prior EEO activities.

38.     Dr. Francis met with Mr. Kenyon to discuss her mid-year performance review on or around June 27, 2013.  At this time, Mr. Kenyon did not express any concerns about Dr. Francis' performance.  Dr. Francis brought up Mr. Kenyon's unreasonable assignment of presenting the training plan to the Agency Budget Officers and summarizing all meetings by June 19, 2013 when she was on leave.  Mr. Kenyon agreed that the assignment was impossible.  However, he later cited this incident in her 2012-2013 year end performance evaluation as an example of a time Dr. Francis missed a deadline to justify lowering her performance rating.

39.     During the June 27, 2013 meeting, Dr. Francis recommended that the DBC work with the Office of the Chief Financial Officer ("CFO") to develop consolidated training, rather than implementing a separate DBC training plan in light of the DBC's lack of a budget for training. Mr. Kenyon agreed with her proposal to confer with the CFO before moving forward with the DBC training initiative, and stated he would put the DBC training initiative on hold, until he met with the CFO.

40.     Mr. Kenyon gave Dr. Francis almost no assignments between June 2013 and November 2013 when he met with the CFO about the DBC training initiative.

41.     In August 2013, Dr. Francis filed a formal EEO complaint, alleging discrimination and retaliation.

42.     On or around August 15, 2013, Dr. Francis met with Andrew Rider, the supervisor of the Departmental E-Budget System ("DEBS"), GS-15, (Caucasian, 40s) in his office to discuss an administrative task for the Continuity of Operations department that she was assigned.  At the end of the meeting, Mr. Rider asked Dr. Francis about her PhD and told her that the Agency was considering implementing an online and classroom continuing education certification initiative for DEBS and that her expertise and training would be helpful for the project.  Mr. Rider described that the education program would require instructors to develop syllabi, course materials, and curriculum and would involve an educational platform for budgeting and execution disciplines. Dr. Francis explained that she had just started as an Adjunct with APUS and her experience in teaching was not sufficient to enable her to lead such a comprehensive education program.  For instance, adjunct faculty members are not responsible for developing APUS courses or syllabi, constructing tests or developing any other course related components and she had no experience in these areas.  Mr. Rider indicated that he would discuss their conversation and the education program with Mr. Kenyon and request his thoughts on how Dr. Francis could assist him with getting the process started.

43.     On or around September 13, 2013, Dr. Francis met with Mr. Kenyon and Mr. Rider regarding the DEBS User Certification training initiative for approximately one hour.  Dr. Francis described her experiences and classes with APUS and told Mr. Kenyon and Mr. Rider that she had achieved her teaching certification so she could teach budget courses, which were developed

11

through the OCFO's assessment.  Mr. Rider asked Dr. Francis for suggestions to improve the current cost of DEBS courses, and she offered her input.  Mr. Kenyon indicated that funding could be a problem, but promised that he would assist on getting funding for the project.

44.      Mr. Kenyon and Mr. Rider then asked Dr. Francis to use her experience and resources with APUS to help with the research and developing phases of the project, and she agreed to do so.  Mr. Kenyon was supportive of Dr. Francis' participation in the project and indicated that it was a very good idea.  He did not express any concerns about Dr. Francis' abilities to perform such an arduous task of researching and implementing the DEBS online training certification program or suggest that her performance was poor, despite Dr. Francis having no experience developing and implementing an online training initiative.  Dr. Francis was not given any training to assist her in accomplishing this project, even though she did not have experience with developing courses and syllabi or constructing tests and other course materials.  However, she copied and saved examples of various course modules and training materials on her work computer for presentation purposes and collected various resources to help with developing the online training initiative.  This was the only assignment Dr. Francis received between July 2013 and her termination in May 2014.

45.      In or around October 2013, Mr. Kenyon approached Edward C. Hugler, Deputy Assistant Secretary for Operations, and requested that Dr. Francis' computer be audited because of her poor performance.  Mr. Hugler directed the audit of Dr. Francis' computer to look specifically for educational websites.

46.      On or around December 2, 2013, Dr. Francis requested that her EEO complaint be amended to include the erosion of her duties as additional examples of the continuous discriminatory and retaliatory harassment she was experiencing.

47.     In mid-December 2013, Mr. Kenyon issued Dr. Francis a false "minimally" successful end-year performance evaluation for the period from October 1, 2012 to September 30, 2013.  The evaluation downgraded Dr. Francis' performance and cited her poor and deteriorating performance as a justification for her poor score.  However, Mr. Kenyon later admitted that Dr. Francis' performance did not change between her June 2013 mid-year performance evaluation in June 2013 and her final evaluation, acknowledged that he never notified Dr. Francis that her performance was poor or declining in any way, and stated that he never gave her any guidance on how she could improve her performance.  In addition, prior to the December 2013 performance evaluation, he never documented any issues or counseled her on her performance.  Further, Mr. Kenyon failed to issue her any updated performance standards after this performance appraisal.

48.     Moreover, the only specific examples of Dr. Francis' purported poor performance in the 2012-2013 performance evaluation were false and/or misleading.  For instance, Mr. Kenyon criticized Dr. Francis for failing to present her training plan to twenty-five different ABOs and provide summaries of all such meetings by June 19, 2013, even though it was impossible for her to complete this task by the deadline considering that she and several other ABOs were scheduled for leave during that time.  In addition, Mr. Kenyon falsely stated that she failed to develop a comprehensive training plan by the May 2013 deadline, when she did complete this assignment by the deadline and was waiting for feedback and additional information from DBC team leads to complete the next stage of the project.

49.     In early February 2014, Dr. Francis submitted her answers to the Agency's interrogatories in one of her EEO cases.

50.     On February 21, 2014, a DBC administrative employee told Dr. Francis that Mr. Kenyon and a representative of the Human Resources department were waiting for her in a

conference room.  When Dr. Francis walked into the conference room, Mr. Kenyon said, "I am proposing to remove you from your position for accessing the APUS website," and he issued Dr. Francis a notice of proposed removal.  The reasons for the proposed removal were: (1) Excessive Use of Government Equipment for Personal, Unofficial Purposes and (2) Improper Use of Official Work Hours for Personal, Unofficial Purposes related to her use of the APUS website.  The Proposed Removal included 63 pages of APUS modules Dr. Francis had visited from March through December 2013 and stated that Dr. Francis spent time during DOL work hours on these sites totaling more than seventy hours.  However, Dr. Francis had only accessed the APUS website to assist her in performing her duties for the Agency.  Specifically, she had utilized her computer to research and save modules from APUS courses to assist her in the development and implementation of the DEBS online continuing education project.  She did not teach any courses or create any APUS work product during work hours.

51.    Dr. Francis was not given any advanced notice of Mr. Kenyon's charges or an opportunity to explain her use of the APUS website, and on May 9, 2014, Dr. Francis was terminated from employment at the Agency based on the false charges in the Proposed Removal.

52.    While Dr. Francis did not engage in any unauthorized use of her computer, younger, male, and Caucasian employees frequently engaged in unauthorized uses of their computers, but were not audited, proposed for termination, or terminated for such activities.  For example, younger, male, and Caucasian employees spent many hours at work watching the "March Madness" basketball tournament and monitoring and discussing the performance of various teams, and no action was taken against these employees.

**COUNT I**
**Violation of Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. § 2000e** *et seq.*
**Discrimination Based on Sex, National Origin and Race**

53.     Plaintiff incorporates by reference paragraphs 1 through 52 as if fully stated herein.

54.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex, national origin or race.

55.     At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

56.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

57.     In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq.*, Defendant knowingly and intentionally subjected Plaintiff to disparate treatment based on her sex, national origin and race by withholding performance standards and assignments; preventing her from performing the official duties of her position and instead requiring her to perform only lower level training coordinator duties; removing her supervisory duties; rating her on duties other than those stated in her official position description; giving her assignments not in her field and outside of her official duties, including administrative tasks not appropriate for a GS-15 level employee; denying her training requests; micromanaging her and monitoring her performance; falsely accusing her of not completing assignments that she completed by the deadlines; giving her unreasonable and impossible assignments; auditing her computer use; assigning her the task of researching and implementing the DEBS online training certification program, but denying her necessary resources; downgrading her performance evaluations based on false and unsupported statements of performance deficiencies; suggesting she use APUS resources to assist her in the DEBS online training certification project, and then proposing her for termination for using APUS

resources for this purpose; and terminating her from employment.  In contrast, male and Caucasian team leads were given supervisory duties in their field and consistent with their official title and job descriptions and were rated based on their official duties; their performance and whereabouts were not monitored and their computer usage was not audited; they were not subjected to false accusations of performance deficiencies, required to perform administrative duties, and given unreasonable and impossible assignments; and they were not terminated, even though they frequently used their work computers to engage in non-work-related activities during work hours.

58.     As a result of such acts, Plaintiff has suffered damages.

**COUNT II**
**Violation of Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. § 2000e** *et seq.*
*Retaliation*

59.      Plaintiff incorporates by reference paragraphs 1 through 58 as if fully stated herein.

60.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because such individual engaged in protected activities, including reporting discrimination.

61.     At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

62.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

63.     Plaintiff engaged in protected activities when she repeatedly reported that she was being subjected to discrimination, retaliation, and a hostile work environment by her supervisors.

64.     In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq*.,

Defendant knowingly and intentionally subjected Plaintiff to retaliation after she complained about discrimination by withholding performance standards and assignments; preventing her from performing the official duties of her position and instead requiring her to perform only lower level training coordinator duties; removing her supervisory duties; rating her on duties other than those stated in her official position description; giving her assignments not in her field and outside of her official duties, including administrative tasks not appropriate for a GS-15 level employee; denying her training requests; micromanaging her and monitoring her performance; falsely accusing her of not completing assignments that she completed by the deadlines; giving her unreasonable and impossible assignments; auditing her computer use; assigning her the task of researching and implementing the DEBS online training certification program, but denying her necessary resources; downgrading her performance evaluations based on false and unsupported statements of performance deficiencies; suggesting she use APUS resources to assist her in the DEBS online training certification project, and then proposing her for termination for using APUS resources for this purpose; and terminating her from employment.

65.     As a result of such acts, Plaintiff has suffered damages.

### COUNT III
**Violation of Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. § 2000e** *et seq.*
**Discriminatory and Retaliatory Hostile Work Environment**

66.     Plaintiff incorporates by reference paragraphs 1 through 65 as if fully stated herein.

67.     Title VII of the Civil Rights Act of 1964 states it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex, national origin or race or because such individual engaged in protected activities, including reporting discrimination.

17

68.     A hostile work environment is a form of prohibited employment discrimination where the employee is subjected to a work environment permeated with ridicule and humiliation that substantially alters the work environment.

69.     At all pertinent times, the Defendant was an employer subject to provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

70.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

71.     In violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq.*, Defendant knowingly and intentionally subjected Plaintiff to a hostile work environment based on her sex, national origin, race, and prior EEO activities by withholding performance standards and assignments; preventing her from performing the official duties of her position and instead requiring her to perform only lower level training coordinator duties; removing her supervisory duties; rating her on duties other than those stated in her official position description; giving her assignments not in her field and outside of her official duties, including administrative tasks not appropriate for a GS-15 level employee; denying her training requests; micromanaging her and monitoring her performance; falsely accusing her of not completing assignments that she completed by the deadlines; giving her unreasonable and impossible assignments; auditing her computer use; assigning her the task of researching and implementing the DEBS online training certification program, but denying her necessary resources; downgrading her performance evaluations based on false and unsupported statements of performance deficiencies; suggesting she use APUS resources to assist her in the DEBS online training certification project, and then proposing her for termination for using APUS resources for this purpose; and terminating her from employment.

72.     As a result of such acts, Plaintiff has suffered damages.

**COUNT IV**
**Violation of the Age Discrimination in Employment Act**
**29 U.S.C. § 633a**
*Age Discrimination*

73.     Plaintiff incorporates by reference paragraphs 1 through 72 as if fully stated herein.

74.     The Age Discrimination in Employment Act, 29 U.S.C. § 633a, provides that, in executive agencies of the United States, all personnel actions affecting employees or applicants for employment who are at least 40 years of age shall be free from discrimination based on age.

75.     At all pertinent times, the Defendant was an employer subject to provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

76.     At all pertinent times, Plaintiff was an employee entitled to protection under the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

77.     In violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633a, Defendant knowingly and intentionally subjected Plaintiff to discrimination based on her age by withholding performance standards and assignments; preventing her from performing the official duties of her position and instead requiring her to perform only lower level training coordinator duties; removing her supervisory duties; rating her on duties other than those stated in her official position description; giving her assignments not in her field and outside of her official duties, including administrative tasks not appropriate for a GS-15 level employee; denying her training requests; micromanaging her and monitoring her performance; falsely accusing her of not completing assignments that she completed by the deadlines; giving her unreasonable and impossible assignments; auditing her computer use; assigning her the task of researching and implementing the DEBS online training certification program, but denying her necessary resources; downgrading her performance evaluations based on false and unsupported statements

of performance deficiencies; suggesting she use APUS resources to assist her in the DEBS online training certification project, and then proposing her for termination for using APUS resources for this purpose; and terminating her from employment.  In contrast, younger team leads were given supervisory duties in their field and consistent with their official title and job descriptions and were rated based on their official duties; their performance and whereabouts were not monitored and their computer usage was not audited; they were not subjected to false accusations of performance deficiencies, required to perform administrative duties, and given unreasonable and impossible assignments; and they were not terminated, even though they frequently used their work computers to engage in non-work-related activities during work hours.

78.     As a result of such acts, Plaintiff has suffered damages.

**COUNT V**
**Violation of the Age Discrimination in Employment Act**
**29 U.S.C. § 633a**
*Retaliation*

79.      Plaintiff incorporates by reference paragraphs 1 through 78 as if fully stated herein.

80.     The Age Discrimination in Employment Act, 29 U.S.C. § 633a, provides that executive agencies of the United States are prohibited from taking personnel actions against employees or applicants for employment who are at least 40 years of age because such individual reported age discrimination.

81.     At all pertinent times, the Defendant was an employer subject to provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

82.     At all pertinent times, Plaintiff was an employee entitled to protection under the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

83.     In violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633a, Defendant knowingly and intentionally subjected Plaintiff to discrimination because she reported

violations of the ADEA by withholding performance standards and assignments; preventing her from performing the official duties of her position and instead requiring her to perform only lower level training coordinator duties; removing her supervisory duties; rating her on duties other than those stated in her official position description; giving her assignments not in her field and outside of her official duties, including administrative tasks not appropriate for a GS-15 level employee; denying her training requests; micromanaging her and monitoring her performance; falsely accusing her of not completing assignments that she completed by the deadlines; giving her unreasonable and impossible assignments; auditing her computer use; assigning her the task of researching and implementing the DEBS online training certification program, but denying her necessary resources; downgrading her performance evaluations based on false and unsupported statements of performance deficiencies; suggesting she use APUS resources to assist her in the DEBS online training certification project, and then proposing her for termination for using APUS resources for this purpose; and terminating her from employment.

84.     As a result of such acts, Plaintiff has suffered damages.

### COUNT VI
**Violation of the Age Discrimination in Employment Act**
**29 U.S.C. § 633a**
**Discriminatory and Retaliatory Hostile Work Environment**

85.     Plaintiff incorporates by reference paragraphs 1 through 84 as if fully stated herein.

86.     The Age Discrimination in Employment Act, 29 U.S.C. § 633a, provides that, in executive agencies of the United States, all personnel actions affecting employees or applicants for employment who are at least 40 years of age shall be free from discrimination based on age or retaliation for reporting age discrimination.

87.     A hostile work environment is a form of prohibited employment discrimination where the employee is subjected to a work environment permeated with ridicule and humiliation

that substantially alters the work environment.

88.     At all pertinent times, the Defendant was an employer subject to provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

89.     At all pertinent times, Plaintiff was an employee entitled to protection under the Age Discrimination in Employment Act, 29 U.S.C. § 633a.

90.     In violation of the Age Discrimination in Employment Act, 29 U.S.C. § 633a, Defendant knowingly and intentionally subjected Plaintiff to a hostile work environment based on her age and prior EEO activities by withholding performance standards and assignments; preventing her from performing the official duties of her position and instead requiring her to perform only lower level training coordinator duties; removing her supervisory duties; rating her on duties other than those stated in her official position description; giving her assignments not in her field and outside of her official duties, including administrative tasks not appropriate for a GS-15 level employee; denying her training requests; micromanaging her and monitoring her performance; falsely accusing her of not completing assignments that she completed by the deadlines; giving her unreasonable and impossible assignments; auditing her computer use; assigning her the task of researching and implementing the DEBS online training certification program, but denying her necessary resources; downgrading her performance evaluations based on false and unsupported statements of performance deficiencies; suggesting she use APUS resources to assist her in the DEBS online training certification project, and then proposing her for termination for using APUS resources for this purpose; and terminating her from employment.

91.     As a result of such acts, Plaintiff has suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE and for the foregoing reasons, Plaintiff respectfully prays as follows:

a.   Issue a declaratory judgment that Defendant's practices toward Plaintiff were violative of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Age Discrimination in Employment Act, 29 U.S.C. § 633a;

b.   Enjoin Defendant from discriminating against employees based on their sex, race, national origin, and age and employees who report discriminatory practices under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Age Discrimination in Employment Act, 29 U.S.C. § 633a;

c.   Award Plaintiff damages, including back pay and front pay and all lost benefits and performance bonuses and compensatory damages for emotional distress and hardship created by the Defendant's discrimination and retaliation;

d.   OR Issue a declaratory judgment reinstating Plaintiff to a GS-15, Step 7 position with another Department, retroactive to the date of Plaintiff's termination, and correcting her personnel record;

e.   Award payment of all fees, costs, expenses, including attorneys' fees and expert fees; and

g.   Award Plaintiff such other relief as to which she may be deemed entitled.

## <u>JURY TRIAL</u>

Plaintiff requests a trial by jury on all issues that are triable by jury.

Respectfully submitted,

_____/s/_____
David A. Branch #438764

Law Office of David A. Branch & Associates, PLLC
1828 L Street NW, Suite 820
Washington, DC 20036
(202) 785-2805 phone
(202) 785-0289 fax
davidbranch@dbranchlaw.com