# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

—————————————————————————  )
                                           )
**JEAN D. FRANCIS,**                       )
                                           )
            **Plaintiff,**                 )
                                           )
      **v.**                               )        **Civil Action No. 16-763 (RMC)**
                                           )
**R. ALEXANDER ACOSTA, Secretary**         )
**of the U.S. Department of Labor**        )
                                           )
            **Defendant.**                 )
                                           )
—————————————————————————  )

## MEMORANDUM OPINION

Jean D. Francis, Ph.D, sues R. Alexander Acosta in his official capacity as Secretary of the Department of Labor for alleged discrimination and retaliation in violation of Title VII of the Civil Rights Act and the Age Discrimination in Employment Act. The government moves for summary judgment. Having fully considered the Parties' arguments and the record after discovery, the Court will grant the government's motion.

## I.    BACKGROUND

Dr. Jean Francis is an African-American female of West Indian descent who was over the age of 40 at all times relevant to this case and who engaged in protected activity by asserting rights to equal employment opportunity (EEO). Def.'s Statement of Undisputed Material Facts (Def.'s SOF) [Dkt. 27] ¶ 2.[1] Dr. Francis joined the Department of Labor (DOL) in June 2007 to serve as Chief of the Branch of Budget Formulation and Implementation in the Office of Management, Administrative and Planning, Employment Standards Administration

—————————————————————

[1] For the reasons discussed in Section III, *infra*, the facts are taken from Defendant's Statement of Undisputed Facts unless disputed by Dr. Francis.

(ESA), a GS-15 position. *See Francis v. Perez*, 970 F. Supp. 2d 48 (D.D.C. 2013) (*Francis I*),

*aff'd Francis v. Perez*, No. 13-533, 2014 WL 3013727 (D.C. Cir. May 16, 2014) (*Francis II*).

Dr. Francis' tenure as Chief was not entirely successful and, on June 22, 2009,

DOL reassigned her "to a non-supervisory position at the same grade level by creating a Special

Assistant [non-supervisory] position for her in the Office of the Director." *Francis*, 970 F. Supp.

2d at 58. In November 2009, DOL was reorganized in part, the ESA was eliminated as a

separate agency, and Dr. Francis was re-assigned to the Departmental Budget Center (Budget

Center or DBC) as a GS-15 Budget Analyst Team Lead. For the period relevant to Dr. Francis'

Complaint, the Budget Center was responsible for overseeing DOL's budget submission and

presentation to the Office of Management and Budget and to Congress. According to her

position description as a Budget Analyst Team Lead, one of Dr. Francis' duties was to develop,

plan, and implement "program strategies that are critical to the development of Congressional

and Presidential budget justifications for the Department." Def.'s SOF ¶ 7. Dr. Francis was also

subject to "administrative and policy direction" concerning "financial management project

priorities and objectives in the organization," established by the Budget Center's Director,

Geoffrey Kenyon, who was Dr. Francis' first-line supervisor. *Id.* ¶ 8. T. Michael Kerr, Assistant

Secretary for Administration and Management, was her second-line supervisor.

Shortly after Dr. Francis arrived at the Budget Center, Assistant Secretary Kerr

introduced a new program whereby the Budget Center was to emphasize customer service and

outreach from the Budget Center to its internal-DOL customers as a primary focus of the office.

Dr. Francis was assigned outreach to the Agency Budget Officers (ABOs) as a primary focus of

her duties.

In Fiscal Year 2010 (FY 2010), Dr. Francis received a "Highly Effective" rating. She received a rating of "Effective" for FY 2011 and FY 2012. However, in FY 2012, as regarding that part of her essential duties related to "Competency Building for ABOs," Dr. Francis received the lesser rating of "Meet." On November 5, 2012, Dr. Francis met with Mr. Kenyon and expressed her dissatisfaction with the "Meet" rating, at which point Mr. Kenyon advised her that she needed to "build trust" with the Agency Budget Officers in order to raise her rating; he suggested that she connect with them by taking them out to lunch. *Id.* ¶ 14. Finding the suggestion demeaning, Dr. Francis complained to Mr. Kerr.

Although Mr. Kenyon remained her official supervisor and responsible for her performance review, Dr. Francis served on an interagency detail to the Department of Justice (DOJ) from June 2012 to March 2013. In April 2013, upon her return, Dr. Francis met with Mr. Kenyon to discuss her new work assignments at the Budget Center. Among other items, Mr. Kenyon directed Dr. Francis to develop a training plan of subjects needed by the Agency Budget Officers. This training plan "was to be a continuation of an assignment she had completed successfully in 2011," to wit, a DOL-wide training program on budget formulation and execution. *Id.* ¶ 16.

Mr. Kenyon sent an email to Dr. Francis on May 10, 2013, to follow up on their meeting and to identify those assignments on which he wanted an update, including the training plan. Dr. Francis responded on the same date, asking Mr. Kenyon to provide his "vision" for the training plan. *Id.* ¶ 17. Mr. Kenyon's email response stated that his vision was the same one he had outlined during their April meeting, which was for Dr. Francis to develop training plans specific to the needs of Agency Budget Officers that DOL staff could provide internally during

FY 2013.[2]  He told Dr. Francis that the topics for training should be guided by "discussions with the ABOs regarding where they think their offices need improvement/development."  Def.'s SOF ¶ 18 (marks omitted).

Mr. Kenyon sent a "follow-up" email to Dr. Francis on May 24, 2013, inquiring about the status of her outstanding work assignments.  There is no evidence that she responded or updated him.  On June 3, 2013, Mr. Kenyon asked directly, "'how are we coming with the training plan?'"  *Id.* ¶ 20.  Dr. Francis sent him a copy of her training plan by email on June 4.  On June 6, 2013, Mr. Kenyon thanked Dr. Francis for the plan, which he found "helpful" but "not what [he] was looking for or what [they] had discussed" in April.  *Id.* ¶ 22.  He again asked Dr. Francis to meet with each Agency Budget Officer and have them identify areas in which they would like to develop more capability.  Further, Mr. Kenyon asked Dr. Francis to complete these meetings by June 19 and to develop a training plan along the lines of their original discussion.  The proposed schedule conflicted with planned leave for Dr. Francis.  Therefore, she sought informal EEO counseling soon thereafter, which evolved into a formal EEO complaint in September 2013 based in part on this conduct.  *See* Def.'s Mem., Ex. 2, Formal EEO Compl. (Sept. 12, 2013) [Dkt. 27-1].

Dr. Francis met directly with Mr. Kenyon on June 27, 2013, to discuss her mid-year review.  At that meeting, they again discussed the need for the training plan.  Nonetheless, neither at the end of the rating period in September 2013 nor at the end of calendar year 2013

---

[2] The Court takes judicial notice of the FY 2013 budget sequestration which substantially reduced all federal budgets in March 2013.  *See* Michael D. Shear, Many Steps to Be Taken When 'Sequester' Is Law, N.Y. Times, Feb. 28, 2013, at A12.  *See also* Def.'s Mem. in Supp. of Mot. for Summ. J. (Def.'s Mem.) [Dkt. 27], Ex. 12, Follow-Up Emails Between Geoffrey Kenyon and Jean Francis [Dkt. 27-1] at 448 ("I want to focus on items and issues we can train using DOL Federal staff because of the lack of resources under sequestration.").

had Dr. Francis met with the Agency Budget Officers or completed a new training plan based on their needs and what DOL could provide with existing resources. Def.'s SOF ¶¶ 23-24.

In September, Mr. Kenyon directed Dr. Francis to work with her colleague, Andrew Rider, on a "Departmental e-Business Suite (DEBS) training initiative." *Id.* ¶ 25. However, Dr. Francis produced no work product for the DEBS training project, although Mr. Kenyon observed her working on her computer. *See id.*; Def.'s Mem., Ex. 13, Dep. of Andrew Rider (Rider Dep.) at 63-64.

In the late summer or early fall of 2013, Mr. Kenyon spoke with Edward Hugler, Deputy Assistant Secretary for Operations, about a transfer for Dr. Francis to a position "where [she] might be more successful." Def.'s SOF ¶ 27. During the course of that conversation, Mr. Kenyon stated that Dr. Francis' work performance had been declining although she appeared busy at her computer. Mr. Hugler suggested an inquiry into Dr. Francis' computer use by DOL's Office of the Chief Information Officer (OCIO) and Mr. Hugler set that inquiry into motion. *Id.* ¶ 28.

OCIO reviewed Dr. Francis' web history and searched her computer hard drive, examining records from late March 2013 (when she returned from DOJ detail) to December 2013. *See* Def.'s Mem., Ex. 15, OCIO Security DOL/DBC Inappropriate Use Inquiry Analysis Report T6599 (OCIO Report) [Dkt. 27-1]. During that time period, Dr. Francis had spent much of her work day on websites associated with the American Public University System (occasionally APUS), an online university; 490 documents in personal folders on Dr. Francis' computer related largely to her studies and work with that University. Def.'s SOF ¶ 30. In fact, starting in March 2013, Dr. Francis had taken several courses with APUS, including Faculty Candidate Training Course; Graduate Faculty Certification Course; APUS 110-Integration of

Multimedia to Enhance Your Classroom; Fostering Teaching Excellence Within the Community

of Inquiry Framework; APUS 214-Effective Time Management in Online Instruction; and APUS

105-Online Library Resources Workshop.  Also revealed on her computer was an April 17, 2013

letter from APUS offering Dr. Francis a position as an adjunct faculty member.  In August 2013,

Dr. Francis began compensated work as a professor for the American Public University System,

and documents and web history from Dr. Francis' computer showed that she was grading student

papers on her work computer during work hours.  *Id.* ¶¶ 33-34.

    During Dr. Francis' tenure at DOL, the Department had a policy governing

employees' use of information technology (IT) which stated, "Employees are authorized limited

personal use of DOL office equipment.  This personal use must not result in loss of employee

productivity or interference with official duties."  *Id.* ¶ 36 (quoting Def.'s Mem., Ex. 19, DOL

Manual Series (DLMS) 9 – Chapter 900, Appropriate Use of IT (IT Policy) [Dkt. 27-1]).  The

IT Policy further provided as an example of inappropriate use "[u]se for commercial purposes or

in support of 'for-profit' activities or in support of other outside employment or business activity

(e.g., consulting for pay, sales or administration of business transactions, sales of good or

services)."  *Id.*  As a DOL senior manager, Dr. Francis had completed four separate training

courses on the Department's computer system which specifically referred to the IT policy and

warned employees that they were responsible for following DOL's IT policies and procedures.

*Id.* ¶ 38; Def.'s Mem., Ex. 20, Jean Francis Learning History [Dkt. 27-1].

    At no point did Dr. Francis seek permission to engage in private studies or work

for APUS on her government computer while working at DOL.

On December 5, 2013, Mr. Kenyon rated Dr. Francis' performance as "Minimally Satisfactory" because she had not completed the training plan for Agency Budget Officers that he had assigned in April.

Mr. Kenyon issued a Notice of Proposed Removal (Notice) to Dr. Francis dated February 21, 2014.  *Id.* ¶ 40.  The Notice did not rely on her performance, as reflected in her most recent rating, but cited two different reasons for her removal:  (1) Excessive Use of Government Equipment for Personal Unofficial Purposes; and (2) Improper Use of Official Work Hours for Personal Unofficial Purposes.  *See* Def.'s Mem., Ex. 22, Notice of Proposed Removal [Dkt. 27-1].  Her proposed removal was sustained on internal appeal and she was removed from federal service effective May 9, 2014.  Def.'s SOF ¶ 43.

Dr. Francis now alleges, based on the facts above, that DOL discriminated against her due to her sex, national origin, and race (Count I), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  She also alleges discrimination because of her age (Counts IV and V), in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621.  Finally, she alleges retaliation and a hostile work environment (Counts II, III, and VI) in violation of both statutes.  *See* Compl. [Dkt. 1].  The government moves for summary judgment.[3]

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure states that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v.*

---

[3] *See* Def.'s Mot. for Summ. J. [Dkt. 27]; Def.'s Mem; Opp'n to Def,'s Mot. for Summ. J. (Opp'n) [Dkt. 30]; Def.'s Reply to Opp'n to Def.'s Mot. for Summ. J. (Def.'s Reply) [Dkt. 32].

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A fact is "material" if it is capable of affecting the substantive outcome of litigation.  *Anderson*, 477 U.S. at 248.  A dispute is "genuine" if there is sufficient admissible evidence such that a reasonable jury could return a verdict for a non-moving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In ruling on a motion for summary judgment, a court must draw all justifiable inferences in the nonmoving party's favor.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  The nonmoving party must point to specific facts showing that a genuine issue of material fact requires trial.  *Celotex*, 477 U.S. at 324.  The nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Id.*  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.  "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial."  *Hussain v. Principi*, 344 F. Supp. 2d 86, 94 (D.D.C. 2004) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. March 31, 1998)).

### III.   ANALYSIS

Certain preliminary issues need immediate attention.

First, Dr. Francis previously sued the Department of Labor in 2012 following her

2009 removal as Chief of the Branch of Budget Formulation and Implementation at ESA,

alleging discrimination, harassment, and retaliation based on her national origin (West Indies)

and religion (Seventh Day Adventist) in violation of Title VII.  Judge Ellen Segal Huvelle of this

Court dismissed her complaint and was affirmed by the D.C. Circuit.  *See Francis II*, 2014 WL

3013727, at *1 ("The merits of the parties' positions are so clear as to warrant summary

action.").  To the extent that Dr. Francis continues to reference these once-contested events

without recognizing that they have been fully litigated, too much time has passed between those

events and the relevant events in this case for the former to have caused the latter.  *See Woodruff

v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("Temporal proximity can indeed support an

inference of causation, but only where the two events are very close in time." (internal marks and

cites omitted)).

Second, although represented by counsel, Dr. Francis failed to submit to this

Court a "separate concise statement of genuine issues setting forth all material facts as to which

it is contended there exists a genuine issue necessary to be litigated," including references to the

record, as required by Local Civil Rule 7(h).  *See* LCvR 7(h).  DOL contends that Dr. Francis has

not controverted any of its facts but "merely sets forth an opposition factual narrative," Def.'s

Reply at 2, and asks the Court to treat all of DOL's facts as admitted by Dr. Francis.

Local Civil Rule 7(h) states in relevant part:

> An opposition to [a motion for summary judgment] shall be
> accompanied by a separate concise statement of genuine issues
> setting forth all material facts as to which it is contended there exists
> a genuine issue necessary to be litigated, which shall include
> references to the parts of the record relied on to support the
> statement. . . .  In determining a motion for summary judgment, the
> Court may assume that facts identified by the moving party in its
> statement of material facts are admitted, unless such a fact is

> controverted in the statement of genuine issues filed in opposition
> to the motion.

LCvR 7(h). "In plain terms, [Rule 7(h)] places the burden on the parties to focus the court's attention on the salient factual issues in what otherwise may amount to a mountain of exhibits and other materials." *Jackson v. Finnegan, Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 153 (D.C. Cir 1996). "The importance of filing a proper [Rule 7(h)] statement is well established." *Id*. at 151 (citing *Gardels v. CIA*, 637 F.2d 700 (D.C. Cir. 1980)). "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes." *Gardel*, 637 F.2d at 773. Indeed, "failure to file a proper . . . statement 'may be fatal to the delinquent party's position.'" *Jackson*, 101 F.3d at 151 (quoting *Gardels*, 637 at 773). That said, Rule 7(h) "does not require litigants to label their . . . statements in a particular manner," although whatever form those statements take must still "functionally . . . comply with the rule's plain terms and purpose." *Id.* at 153.

Dr. Francis' Opposition contains a section titled "Plaintiff's Statement of Facts & Material Facts in Dispute." Opp'n at 2-14. In it, Dr. Francis has laid out her own competing narrative. To a significant extent this counter-narrative does not challenge DOL's facts or identify facts in dispute, much less material facts in genuine dispute. Therefore, most of DOL's Facts, cited above, are treated as uncontested for the purposes of summary judgment.

However, Dr. Francis' Statement makes clear that even if DOL has set forth a legitimate, non-discriminatory reason for her termination, she believes that reason is pretextual. Specifically, she challenges the legitimacy and accuracy of the audit of her computer files; questions the explanation for her "Minimally Satisfactory" performance rating in 2013 as internally inconsistent; and asserts that her treatment by Mr. Kenyon began to deteriorate following a complaint by her in November 2012 to Mr. Kerr about Mr. Kenyon, and

progressively worsened after she began the EEO complaint process later that summer, which the Court understands to assert a retaliation claim. *See* Opp'n at 8-14. The Court addresses these arguments on the merits.

Third, while Dr. Francis' narrative and argument appear to include citations to the record, many of her citations are inaccurate and several quotes are nowhere to be found in the cited exhibits. It often appears as though Dr. Francis is citing another record entirely. To the extent the evidence underlying her facts is missing from the record, even if those facts contradict facts set forth by DOL, they are insufficient to raise a genuine issue of material fact. *Greene*, 164 F.3d at 675.

### A. Disparate Treatment Under Title VII and the ADEA

Title VII prohibits discrimination in the workplace because of an individual's race, color, sex, religion, or national origin. 42 U.S.C. § 2000e-16. Similarly, the Age Discrimination in Employment Act (ADEA) prohibits discrimination against employees based on age. *See* 29 U.S.C. § 623 (making it unlawful "to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age"); 29 U.S.C. § 633a (extending ADEA protections to most federal employees). "Under Title VII [and] the ADEA, the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, [or] age." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Under both Title VII and the ADEA, a plaintiff can prove her

case with either direct or circumstantial evidence. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).[4]

If a plaintiff cannot provide direct evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework: (1) the plaintiff must establish a prima facie case demonstrating that she was subjected to an adverse employment action under circumstances that would support an inference of discrimination; (2) the defendant may then come forward with a legitimate, non-discriminatory reason for its actions; if the defendant does so, (3) the plaintiff must demonstrate that such legitimate, non-discriminatory reasons were pretextual justifications to hide discrimination. *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003). Once an employer asserts a legitimate, non-discriminatory reason for the action(s) taken, the need to analyze the *prima facie* case drops away and "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

*1. Termination*

DOL's Notice of Proposed Removal cited two legitimate, non-discriminatory reasons for Dr. Francis' removal: (1) Excessive Use of Government Equipment for Personal Unofficial Purposes; and (2) Improper Use of Official Work Hours for Personal Unofficial

---

[4] ADEA has a stricter causation requirement than Title VII: age must be the "but-for" cause of the adverse action and not merely a "motivating factor." *See Gross*, 557 U.S. at 174. But because the Court finds Dr. Francis cannot support her Title VII claim under even the mixed-motive standard, which evidence is the same for her ADEA claim, the Court need not belabor the distinction.

Purposes.  *See* Notice of Proposed Removal; OCIO Report at 3 ("On a typical day, the subject

would spent [sic] about 10 minutes to possibly two hours or more per day accessing .edu related

websites."); Def.'s Mem., Ex. 17, Dep. of Patrick Andrew Browne (Browne Dep.) [Dkt. 27-1] at

23-24 ("There was a large box of files taken from Dr. Francis' computer that were accessed

during duty hours that showed activities such as giving feedback to students on their graded

work.").

       Dr. Francis argues that the accuracy of the OCIO report is "suspicious" and that

the IT audit conclusions on her computer use are not credible.  But Dr. Francis mis-reads the

record evidence and her arguments are unavailing.  She contends that the OCIO report

documented an incredible number of "hits" by her computer to educational websites and that Mr.

Kenyon admitted that such "hits" were an unreliable basis for measuring Internet use.  Opp'n at

12; Opp'n, Ex. L, Tr. of Merit Sys. Prot. Bd. Hearing (MSPB Tr.) [Dkt. 31-2] at 157-58.  But

while Mr. Kenyon agrees with her on the reliability of "hits," Dr. Francis ignores that part of his

testimony stating that he, accordingly, "did not rely on the number of hits when proposing

removal."  *Id.* at 157.   Dr. Francis further fails to rebut those portions of the OCIO Report which

explicitly documented her "browse time."  *See* OCIO Report at 19-20.

       Similarly, Dr. Francis argues that Mr. Kenyon altered the OCIO report while

correcting drafting errors.  Opp'n at 12 (quoting MSPB Tr. at 147).  Her argument grossly

mischaracterizes Mr. Kenyon's testimony:  he was not testifying about editing the OCIO Report

but editing the Notice of Proposed Removal; the edit was more in the nature of a typographical

error and nothing more.  *See* MSPB Tr. at 147 ("That was just a drafting error. . . . [W]e just

didn't catch that on the last edit."); *id.* at 148 ("Q:  Does it matter to you that there is 15 and not

18 specifications?  A:  No.").  Neither of these arguments casts material doubt on the veracity of

the OCIO Report and Dr. Francis has not established facts contradicting either of DOL's two stated reasons for her removal. Importantly, notwithstanding Dr. Francis' complaints about the details of the OCIO report, at no point does she actually deny that she was taking online classes or grading APUS assignments while on the clock for DOL.

Lacking direct evidence of discrimination, Dr. Francis argues that she was subjected to disparate treatment compared to similarly-situated employees in the Budget Center. Her Opposition to the government's motion advances four statements to support her claim: (1) "Younger, Caucasian, and American-born team leads were given superior duties and were responsible for leading a team of lower-level employees," Opp'n at 4 (citing "Ex. C at 8-9; Ex. H at 28, 77-78, 89-90; Ex. J at 22-25; 30-33"); (2) "Further, younger, Caucasian, and American-born team leads were invited to attend meetings from which [Dr. Francis] was excluded," *id.* (citing "Ex. C at 8-9; Ex. H at 28, 77-78, 89-90; Ex. J at 22-25; 30-33"); (3) "Younger, Caucasian, and American-born budget analysts were given budget assignments. However, Mr. Kenyon did not assign [Dr. Francis] any budget work at all," *id.* (internal cites omitted) (citing "Ex. C at 8-9; Ex. H at 28, 77-78, 89-90; Ex. J at 22-25; 30-33"); and (4) "In juxtaposition, Mr. Kenyon did not micromanage or monitor the performance of [Dr. Francis'] younger, male, and Caucasian GS-15 colleagues even though[] these colleagues regularly left work in the afternoon for multiple hours at a time for 'coffee breaks' and were not questioned about their location or the status of their work," *id.* at 9 (citing "Ex. B 00011").

These allegations might raise a genuine dispute about disparate treatment and pretext if they had factual support in the record. Such support cannot be found. Plaintiff's Exhibit C, from which these facts are essentially quoted, is merely Dr. Francis' proposed Amended Complaint which does not constitute factual evidence. *Greene*, 164 F.3d at 675

("Accepting such conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device."). In citing the Amended Complaint, Dr. Francis also references Exhibit 11 to that Amended Complaint but does not include it or show why it should be admitted as part of the record.[5]

Dr. Francis also cites excerpted testimony of Mr. Kenyon in which he confirmed that other Budget Team Leads had different responsibilities. *See* Opp'n, Ex. H, Dep. of Geoffrey Kenyon (Mar. 19, 2015) (2015 Kenyon Dep.) [Dkt. 31-1] at 28; Opp'n, Ex. J, Dep. of Geoffrey Kenyon (Mar. 16, 2017) (2017 Kenyon Dep.) [Dkt. 31-1]. Nowhere in the submitted testimony, however, did Mr. Kenyon identify or otherwise mention the race, age, national origin, or gender of those other employees and Dr. Francis similarly omits these important facts. Indeed, she has failed to identify, *with evidence*, similarly situated Budget Team Leaders of different races, gender, national origin, or age who were treated more favorably. Such facts are the *sine qua non* of a claim of disparate treatment based on protected status, without which Dr. Francis has only speculation and argument. Even if there were demonstrable inconsistencies in DOL's reasons for conducting an IT audit of her computer usage or lowering her performance rating, "[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993). Dr. Francis has proffered no facts to support her allegations that Mr. Kenyon or Mr. Kerr considered her race, gender, national origin, or age in making employment decisions concerning her. Without genuine evidence of a material dispute, Dr. Francis has not satisfied her "obligation to

---

[5] In fact, the Court *denied* leave to Dr. Francis to file the Amended Complaint. *See* 6/14/17 Mem. Op. and Order [Dkt. 24]. However, identical allegations (albeit without citations to exhibits) were included in the original Complaint. *See* Compl. ¶¶ 20-22, 33.

support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Hussain*, 344 F. Supp. 2d at 94.

Finally, Dr. Francis argues that she was taking and teaching online classes with APUS for DOL's benefit, not her own. Although she argues that she informed her coworkers, and indirectly Mr. Kenyon, that she might use her experience with APUS to facilitate her training work for DOL, *see* Opp'n at 19-20 (citing Rider Dep. at 69-71), the testimony she cites for this assertion provides no such support:

> Q: Mr. Rider, the conversation . . . was around Dr. Francis' work that she would be potentially doing with the university; is that correct?
> A: I don't recall that.
> Q: And right after the conversation when Dr. Francis told you she had just started with APUS, and you stated it would work with the new DEBS certification program, you told Mr. Kenyon about the conversation; is that correct?
> A: I don't recall. Are you talking about the conversation we held when you were in my doorway . . . ? Again, that was an inconsequential conversation in passing. I believe you had just printed something off the printer and were near my office and stopped by just to say "Hi." I would never have gone to Mr. Kenyon and reported that type of conversation.
> Q: So what I'm hearing you say, you never went to Mr. Kenyon and told Mr. Kenyon about the conversation you had with Dr. Francis regarding her affiliation with the university?
> A: Again, any affiliation with the university was always understood by me that it was your Ph.D. that you had earned.

Rider Dep. at 69-70. Indeed, Dr. Francis' own exhibits indicate that she never told anyone, much less her direct supervisors, about her engagement with APUS and certainly never received authorization. *See* MSPB Tr. at 141-42 (Mr. Kenyon testifying "I felt that Jean had hidden [APUS] from me, that she knew it was wrong, and she intentionally did not disclose this."). Dr. Francis suggests that she was encouraged to use her experience at APUS to develop and implement a training plan at DOL, but none of the deposition testimony she cites supports her argument. *See id.* at 139 (Mr. Kenyon testifying "it occurred to me that she was . . . doing

outside work for American Public University and not the job and responsibilities that I had given her.").  In addition, Dr. Francis implies that because (1) she was a GS-15 employee responsible for some training, (2) afforded broad discretion with her time, and (3) no one told her explicitly *not* to take and teach APUS classes on government time, doing so was therefore related to her official duties and legitimate work on her part.  The argument fails in the face of direct and applicable DOL policies on the use of government IT resources.

### 2.  Negative Rating

DOL states that Dr. Francis received a "Minimally Satisfactory" rating in FY 2013 after she failed to complete the training assignment by September 2013 that she had been directed to develop in specific ways in April 2013.  DOL points to the details in her FY 2013 performance review.  *See* Def.'s Mem., Ex. 18, Performance Mgmt. Plan for Non-Managers and Non-Supervisors [Dkt. 27-1] at 224.

Dr. Francis argues that Mr. Kenyon's explanations for her performance rating in 2013 are inconsistent and therefore unreliable.  She quotes Mr. Kenyon's various statements that her work was "fine" but overlooks his repeated qualification that "she did not complete the objective that I had originally set out."  *See, e.g.*, MSPB Tr. at 222.  Dr. Francis does not dispute that she and Mr. Kenyon discussed, in April 2013, the kind of training he wanted her to develop for Agency Budget Officers; that she sent him an incomplete plan on June 4, 2013; that he responded it was "helpful" but not sufficient; and that she never talked to the Agency Budget Officers or proposed a complete and acceptable plan as requested during the rest of FY 2013 or calendar year 2013.  Def.'s SOF ¶¶ 16-24.  Further, Mr. Kenyon's observations about the mixed quality of Dr. Francis' work are corroborated by his complaint to Mr. Hugler.  *See* Def.'s Mem., Ex. 14, Dep. of Edward Hugler (Hugler Dep.) [Dkt. 27-1] at 9-10 ("Mr. Kenyon told me . . . that he was not getting the productivity from you that he would expect.").  Dr. Francis' argument that

Mr. Kenyon commented favorably or neutrally on her work completely ignores the uncontested facts that he repeatedly expressed concern because she failed to complete a major assignment in a timely manner. *See, e.g.*, MSBP Tr. at 222.

"Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Federal courts "may not second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016) (citation omitted). "[P]erformance reviews typically constitute adverse actions only when attached to financial harms," which are not shown here. *Baloch*, 550 F.3d at 1199.

The record does not support the argument that Mr. Kenyon was inexplicably inconsistent in his reviews of Dr. Francis' work. In contrast, her failure to complete an important assignment after more than half a year—the stated reason for her performance rating—is uncontested and clearly supported.

Further, Dr. Francis does not contend that she had approval for her private-sector work with and for APUS while supposedly performing her public-sector job. Dr. Francis' frustration because she had been sidelined from a major role at ESA and kept out of a major role at the Budget Center is almost palpable. Her answer to that frustration—to fail to perform her DOL job and, instead, to prepare for and assume a job teaching at the American Public University System on government time—was no answer.

Dr. Francis has provided no evidence connecting her performance rating with her sex, age, gender, or national origin. Although Mr. Kenyon admits that he has never given

anyone else a "Minimally Satisfactory" rating, Dr. Francis received "effective" or better reviews until she, admittedly, failed to complete the April 2013 assignment by the end of the fiscal (and performance) year. On this record, more critically, Dr. Francis alleges no harm arising from her 2013 rating: her termination was based on her improper computer use, not on her performance. There is, therefore, no genuine dispute of material fact concerning Dr. Francis' performance rating in FY 2013.

### 3. Other Adverse Actions/Hostile Work Environment

Beyond her removal, Dr. Francis recites as part of each of her Counts a litany of other allegations concerning her work at the Budget Center related to training, the scope of her duties, her deadlines, scheduling conflicts, micromanagement, available resources, and the audit of her computer. *See* Compl. ¶¶ 57, 64, 71, 77, 83, 90.

An adverse action against an employee requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . a significant change in benefits," *Burlington Indus., Inc. v. Ellerth*, 523 U.S. 742, 760-61 (1988).

Although Dr. Francis may have been dissatisfied with the work to which she was assigned under the Assistant Secretary's initiative, she does not contest that she had previously developed a DOL-wide budget training plan and was assigned, upon her return to DOL, to develop specific training for Agency Budget Officers that was consistent with the Assistant Secretary's priorities and their needs. This assignment may have been distasteful but was not outside her position duties to plan, *develop*, and implement "*program strategies* that are critical to the development of Congressional and Presidential budget justifications for the Department," *subject to* the "administrative and *policy direction*" concerning "*financial management project priorities and objectives* in the organization" as established by DBC's Director. Def.'s SOF ¶ 7

(emphasis added).  Dr. Francis has provided the Court with no evidence showing that the tasks she was given were somehow outside what might have been expected of her, even if she does not believe that those tasks were "appropriate for a GS-15 level employee."  Compl. ¶ 57.  Her dissatisfaction did not turn her assignments into adverse actions.  That she was dissatisfied with the work assigned does not mitigate her excessive use of government time and resources for her personal ends.

To establish a hostile work environment, a plaintiff must allege facts sufficient to demonstrate that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch*, 550 F.3d at 1201.  The hostile work environment standard is "sufficiently demanding" to ensure that it is not a "general civility code."  *Id.*  Further, a plaintiff must demonstrate "some linkage between the hostile behavior and the plaintiff's relationship in a protected class."  *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009).

Dr. Francis' hostile workplace claim fails for lack of evidence.  She particularly relies on her "Minimally Satisfactory" rating and her termination but each rating was a distinct act based on different underlying facts, which are uncontested.  As to the laundry list of minor grievances in her Complaint, *see e.g.*, Compl. ¶ 57, none is supported with factual evidence beyond the Complaint allegations.  Dr. Francis proffers no comments or actions to show that she was targeted or treated differently from her peers because she is a member of a protected class.  Without such evidence, Dr. Francis fails to demonstrate "severe" or "pervasive" harassment due

to her protected status, which is necessary to support a claim of a hostile work environment. Much of her ire seems to be directed at Mr. Kenyon for "following up" on the progress of her work between April and June 2013, which Dr. Francis might have found vexing but is merely part of everyone's work life. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (finding courts must "filter out complaints attacking 'the ordinary tribulations of the workplace'").  While Dr. Francis points to a single instance in which Mr. Kenyon set a deadline that conflicted with her previously-planned leave, she fails to address—or challenge—his statement that he did not know she had planned leave, "apologized for any miscommunication regarding her June leave request[,] and we jointly determined what work assignments would be accomplished and deadlines for doing so."  Pl.'s Mem., Ex. 6, Aff. of Geoffrey Kenyon (Kenyon Aff.) [Dkt. 27-1] at 900; *Cf. Fragher*, 524 U.S. at 788 ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment.").

   As part of her hostile work environment claim, Dr. Francis challenges the audit of her computer.  Importantly, Dr. Francis does not dispute that Assistant Secretary Hugler suggested the OCIO audit to Mr. Kenyon and that Mr. Hugler ordered it to be conducted, at a time when Mr. Hugler knew very little about Dr. Francis and did not believe or intend the audit to be particularly exceptional due to Mr. Kenyon's report about her work performance.  *See* Hugler Dep. at 9-11.  Dr. Francis proffers no direct or inferential evidence that Mr. Hugler intended thereby to discriminate against her.

   Finally, it must be pointed out that the majority of the allegedly-supporting citations in Dr. Francis' briefs are to her Amended Complaint, her EEO complaint, and other briefs in this case, but not to admissible evidence.  *Greene*, 164 F.3d at 675.

### B. Retaliation

"To establish a claim for retaliation, a claimant must show that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection existed between the two." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). The standards for an "adverse action" to prove discrimination and a "materially adverse action" to prove retaliation "are not coterminous"—a retaliation complaint requires only action which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (marks omitted).

When based on an inference of retaliation due to the timing between protected activity and a materially adverse action, the act of retaliation must follow the protected activity within a "very close" time. *Woodruff*, 482 F.3d at 529; *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing favorably cases where 3-4 months was too long to establish causality). A quick review of relevant events is appropriate: Dr. Francis' 2009 EEO complaint (which did not involve Mr. Kenyon) was fully adjudicated in October 2013; in November 2012, while she was on detail to DOJ, Dr. Francis sent a memo to Assistant Secretary Kerr complaining about Mr. Kenyon's suggestion that she take the Agency Budget Officers out to lunch; Dr. Francis contacted an EEO Counselor to lodge an informal EEO complaint in the summer of 2013 and then filed a formal EEO Complaint in September 2013, just before the end of the fiscal year and her FY 2013 performance evaluation in December 2013; Dr. Francis submitted her investigative affidavit in support of her EEO complaint on February 13, 2014; and Mr. Kenyon issued the Notice of Proposed Removal on February 21, 2014. *But see* Kenyon Aff. at 913 ("Since December 18, 2013, I have been working . . . to propose the Complainant be terminated due to excessive use of government equipment for personal, unofficial purposes.").

The Court finds that the 2009 EEO complaint and Dr. Francis' November 2012 memo to Assistant Secretary Kerr occurred long before Dr. Francis' 2013 performance review or the 2014 Notice of Proposed Removal so that no inference of a discriminatory connection can be made.

A different analysis must be applied to the sequence of Dr. Francis' protected activities thereafter (informal and formal EEO complaints in summer/fall 2013 and investigative affidavit in February 2014) and her FY 2013 performance review in December 2013 and the Notice of Proposed Removal on February 21, 2014.

Because there is no direct evidence of discriminatory or retaliatory intent, the timing of events may supply the necessary inference.[6]  Dr. Francis perceives Mr. Kenyon's following up on the progress of her work, her negative review, and her termination as discriminatory or retaliatory.  But the follow-ups occurred after Dr. Francis met with Mr. Kenyon in April 2013, before any protected activity by Dr. Francis, and so could not, perforce, be retaliatory.[7]  There is also no direct or circumstantial evidence to support the allegation that it was discriminatory for her supervisor to ask for progress reports on an assignment she never performed at all or that such inquiries amounted to an adverse action or a materially adverse

---

[6] Dr. Francis argues further that "[Mr.] Kenyon did not provide any assignments between December 2013 and May 2014," Opp'n at 13, and her computer account was "set to be either disabled or purged" as early as October 2013.  *Id.*  These arguments represent bald allegations only, without citations to evidence in the record.

[7] Dr. Francis met with an EEO Counselor and lodged an informal EEO complaint in June 2013 after Mr. Kenyon set a deadline for her that interfered with planned time off.  He testified:

> Well, Dr. Francis had just told me how she found my style harassing, and we had a good meeting and came to agreement on how we would move forward on getting the training plan.  So I decided to treat her the way she had asked to be treated and let her take responsibility for completing the tasks that she agreed to take on.

Def.'s Mem., Ex. 5, Dep. of Geoffrey Kenyon (Kenyon Dep.) [Dkt. 27-1] at 109-10.

action.  As discussed, her negative performance review was based on uncontested facts; she *never* completed the April 2013 assignment to meet with the Agency Budget Officers, learned what areas of training would be most helpful to them, or developed a training program that could be provided by DOL personnel.  She offers no factual basis to tie this review to any one of her protected classes.  Dr. Francis filed a formal EEO complaint in September 2013.  The audit of her computer usage was conducted soon thereafter but no inference of retaliation (or discrimination) can be found because the results of the audit are not contested by Dr. Francis. (While Dr. Francis quibbles about certain aspects of the audit, her quibbles are without merit and, critically, she does not actually deny her time and attention to APUS using DOL IT equipment and DOL work time.)  Further, Mr. Kenyon was not aware of the formal EEO complaint until after the audit was performed.  *See* Kenyon Dep. at 197 ("[I]n February 2014 I was informed that it was turned into a formal complaint and I had a longer questionnaire.").

Finally, Mr. Kenyon proposed her removal in February 2014 and Dr. Francis was separated from DOL in May 2014 due to using government time and assets while both taking APUS courses and teaching APUS courses without approval.  These latter facts are, again, uncontested and Dr. Francis fails to tie them to any prior protected activity or protected class.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, Dkt. 27, will be granted.  A memorializing Order accompanies this Memorandum Opinion.


Date: April 25, 2019                                   _____
                                                       ROSEMARY M. COLLYER
                                                       United States District Judge